

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00041-CR

_____

CAYLON JAMES WASHINGTON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1798778

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Without the benefit of a plea bargain, Appellant Caylon James Washington pleaded guilty to six counts of aggravated sexual assault. *See* Tex. Penal Code Ann. § 22.021. Washington's punishment was tried to a jury, and the jury assessed his punishment at 55 years' confinement. The trial court sentenced Washington accordingly.

On appeal, Washington contends that the trial court erred by allowing the State to call as a rebuttal witness the complainant's mother, arguing that she testified in violation of "the Rule" and that she was not a "true rebuttal witness." Because we conclude that any error in admitting Mother's testimony did not affect Washington's substantial rights, we affirm the trial court's judgment.

## I. Background[1]

### A. Factual Background

On June 27, 2022—the night of the sexual assault—the complainant, M.R.,[2] went out with some friends in the West 7th area of Fort Worth. At some point, M.R. and her friends got separated, so she walked back to her car alone. When she reached

---

[1]Because Washington does not challenge the sufficiency of the evidence, we omit a detailed factual background.

[2]To protect the complainant's identity, and the identity of an extraneous-offense witness, we use initials; for the same reason, we use aliases to refer to the complainant's friends and family. *See* Tex. R. App. P. 9.8 cmt.; 2nd Tex. App. (Fort Worth) Loc. R. 7; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

her car, which was in a parking lot behind one of several bars in the West 7th area, she got in, shut the door, and started the car. Seconds later, Washington, who was a stranger to M.R., knocked on her window. She partially rolled the window down, and Washington told her that she was "really pretty." She responded that she had a boyfriend, and he asked if they could "just be friends." When M.R. declined, Washington pulled a gun from his pocket and pointed it at her head. M.R. "froze in fear," and believing that Washington intended to rob her, she offered him her car and money. He responded that he did not want her money but that he "wanted [her] pussy."

Keeping the gun to M.R.'s head, Washington forced his way into her car. M.R. tried to resist, but he told her that she "was not the one making the decisions." Washington then proceeded to sexually assault M.R. multiple times. The gun, which had a laser on it, was in Washington's hands the entire time.

At one point during the sexual assault, Washington threatened M.R., telling her that "if [she] ever wanted to see [her] family again to pretend that [she] was enjoying it." She complied.

After he "finished," Washington told M.R. that it had been "all for fun." He then apologized to her, stating that he was "sorry that he had to scare [her] and that he could never really hurt someone." He told her he was a "lover."

After the sexual assault, Washington jumped out of M.R.'s car, and she quickly drove away. She called her friend Casey and told her what had happened. Casey instructed M.R. to drive back to her apartment. Casey waited for her in the parking lot

3

and then drove her to JPS Hospital, where she was examined by a sexual assault nurse examiner (SANE) and interviewed by a police officer.

Following an investigation, Washington was arrested and charged with aggravated sexual assault.

## B. Punishment Trial

At Washington's punishment trial, the jury heard testimony from and viewed physical evidence through several witnesses. The State's witnesses included M.R.; Casey; the SANE who examined M.R. at JPS; the police officer who responded to JPS; Sergeant Andrew Owen, who investigated the sexual assault; and a DNA analyst expert that tested the DNA evidence in this case. The State also introduced extraneous-offense evidence through J.W., another alleged victim of Washington's.

The witnesses who testified for the defense were Dr. Richard Schmitt, a psychologist whom the defense had hired to evaluate Washington in preparation for trial, and Washington's girlfriend, Felicity Gallegos. The defense then recalled Sergeant Owen to question him about J.W.'s claims.

After the defense closed, the State called M.R.'s mother as a rebuttal witness. She had not been listed as a potential witness, and she was present in the courtroom for all the witnesses' testimonies, other than M.R.'s testimony. The State proposed that Mother would testify about her family and background and about her personal observations of the impact that the sexual assault had had on M.R. and their family.

Washington objected to Mother's testimony and requested a mistrial because the State had called Mother "in front of the jury," because Mother had been in the courtroom in violation of "the Rule," and because the testimony was not "true rebuttal." After hearing arguments from counsel and the proffered testimony from Mother, the trial court overruled Washington's objection, denied the request for a mistrial, and admitted Mother's testimony.

**1. M.R.'s Testimony**

M.R. testified about the sexual assault and its lasting effect on her life. She described, in detail, how Washington had sexually assaulted her and how he had used verbal threats and a gun to force her to comply. She expressed that she had felt powerless and that she was "really scared." M.R. believed that Washington was going to kill her.

When asked about the days following the sexual assault, M.R. testified that it "felt like a nightmare, and all the days . . . started to blend together." She was afraid to leave her bedroom because she feared that Washington would be on the other side of the door. She stopped driving her car and eventually decided to sell it. She quit her job and was unemployed for months because she was too afraid to drive.

M.R. also testified that, since the sexual assault, she could not go anywhere at night, could not go out to crowded places with friends, and had to have someone with her "at all times." She told the jury that what Washington had done to her would "affect [her] every day for the rest of [her] life."

5

### 2. Casey's Testimony

Casey testified that when M.R. called her after the sexual assault, it "terrified" her. As she described to the jury what M.R. had told her during the phone call, the trial judge had to remind Casey to breathe.

Casey explained that during the phone call, M.R. had been "crying and distraught, and she was so scared." When M.R. got into Casey's car to drive to JPS, she was in shock. Casey described M.R.'s demeanor as "a totally different person" and "not herself."

When asked about how M.R.'s life had changed since the sexual assault, Casey stated that M.R. had completely changed. M.R. had once been a strong, independent person, "but that independence got wiped away from her. . . . [S]he was scared to do anything by herself[, and] [s]he couldn't even drive her own car anymore." Casey and her friends would "take shifts" to ensure that M.R. was never alone. She told the jury that Washington had "altered [M.R.'s] life" and that she would never be the same person.

### 3. J.W.'s Testimony

J.W. testified about an encounter she had had with Washington just six months before he sexually assaulted M.R. One night in January 2022, J.W. got a flat tire and began walking to her mother's house. She had been walking down University Drive—near the West 7th area—for about fifteen minutes when a car approached her. The driver, Washington, offered her a ride. J.W. got into Washington's car, and as he

6

drove, he told her that the ride was "going to cost [her]." J.W. offered to pay him money, but he told her, "No. You're going to suck this dick."

At the next stop light, J.W. got out of Washington's car and ran. Washington followed her in his car until she physically could not run anymore. He then got out of his car, put what she thought was a gun or other weapon to her head, and forced her back into his car. J.W. believed that Washington was going to rape her, traffic her, or kill her.

J.W. then saw another car on the road. As it began to drive by, she jumped out of Washington's car again and started yelling for help. The driver of the other car stopped to help J.W. and called the police. Washington drove off in his car.

When asked about how that night had affected her, J.W. testified that she was "always looking over [her] shoulder" and that walking alone made her nervous. She expressed that she felt "glad that [she had] got[ten] away."

**4. Sergeant Owen's Testimony**

Sergeant Owen testified about his investigation of M.R.'s sexual assault, which he described as "violen[t]" in nature. Through Sergeant Owen's testimony, the jury viewed surveillance video from the parking lot in the West 7th area where M.R. had parked her car. Sergeant Owen explained that, from the surveillance video and M.R.'s physical description of the suspect, he was able to locate and interview Washington, who confessed to the sexual assault.

The jury viewed a copy of Sergeant Owen's interview with Washington. In the interview, he told Sergeant Owen that he had problems "[c]ontrolling sexual urges"

7

and that he had been a "chronic masturbator" who eventually "sought out a victim." He explained that he sexually assaulted M.R. because he had been "triggered" by "people laughing at him." Sergeant Owen testified that, in his opinion, that showed a lack of "impulse control."

However, Washington also told Sergeant Owen that, before the sexual assault, he had been in the West 7th area for hours "looking for a female walking alone" to take advantage of. This, according to Sergeant Owen, went beyond mere impulse control. He told the jury that, out of the five hundred sex crimes cases that he had investigated, this sexual assault was the most severe case he had ever seen.

Sergeant Owen also investigated J.W.'s case. He testified that J.W. had not been able to identify Washington in a photo lineup.[3] He ultimately decided not to file charges in J.W.'s case because there was not enough evidence to support filing that case.

During his investigation of M.R.'s sexual assault, Sergeant Owen decided to revisit J.W.'s case. He explained that there were similarities between J.W.'s and M.R.'s cases, which had prompted him to reference his police report from J.W.'s case and to provide that information to the D.A.'s office. J.W.'s physical description of Washington, for example, was so similar to M.R.'s physical description of Washington that Sergeant Owen believed he could have been the suspect. Then, when Sergeant Owen interviewed Washington about this case, he corroborated J.W.'s previous

---

[3]At the punishment trial, J.W. identified Washington as the man who had picked her up in January 2022.

8

statement, and he admitted that he was the individual who had picked her up that night in January 2022.

**5. Dr. Schmitt's Testimony**

Dr. Schmitt testified that his evaluation of Washington consisted of meeting with him three times. He explained that he had not had "a lot of preparation time" before Washington's trial. He also explained that, in preparing Washington's psychological profile, the information upon which he based his professional opinion had been provided by Washington and his family members.

Dr. Schmitt described to the jury the psychological testing that he had done with Washington. He opined that Washington had severe anxiety and depression and that he was paranoid. When asked for his opinion regarding the sexual assault, Dr. Schmitt testified that it was a "violent act" but that it had been "a crime of opportunity and impulse." He explained that, when Washington sexually assaulted M.R., he had been feeling "troubled, he was depressed, he was anxious[, and h]e was unhappy," and he simply "acted on that impulse." On cross-examination, however, when confronted with Washington's statement that he had been in the West 7th area for hours looking for a victim before he sexually assaulted M.R., Dr. Schmitt opined that the sexual assault could not be characterized as a crime of impulse because Washington would have had "time to reflect on what he was thinking to do."

Dr. Schmitt testified that since the sexual assault, Washington began taking medication and attending therapy. He described Washington as "remorseful" and

expressed that he was "committed to changing himself." He then testified generally about his previous work with sex offenders, the success rates of psychological treatment, and recidivism rates. Regarding Washington, Dr. Schmitt opined that his issues were treatable.

### 6. Gallegos's Testimony

Gallegos testified that she and Washington began dating in November 2021. She described him as her "protector" and her "home," and she expressed that he made her feel safe. When asked how she felt about the sexual assault, Gallegos stated that it was "not an okay situation" but that it was "very tough for both sides." She asserted that Washington was remorseful and that he had been "going through a lot." While Gallegos acknowledged that the sexual assault was horrific, she stated that Washington had been upfront with her about the "situation" and that he was getting the help and support that he needed.

On cross-examination, Gallegos testified that what Washington did to M.R. was "not necessarily" one of the most horrendous things a person could do to someone. When asked whether a person who commits such an act should be held accountable, she responded, "[t]o an extent." She then opined that it is "a woman's job" to protect herself from being attacked or raped.

Gallegos told the jury that Washington was "funny and goofy" and that he was "a great guy." She asserted that what he did to M.R. does not "define[] him because he is a lot more than that." She opined that Washington had "come a long way" since

the sexual assault and that he was capable of redemption.

### 7. Mother's Testimony

The State offered Mother's testimony to rebut Gallegos' testimony about how the sexual assault had impacted Washington and his family.

Mother testified that M.R. was her youngest daughter and that, before the sexual assault, she was "very outgoing, very fun, [and would] go out." After the sexual assault, Mother saw personality changes in M.R. She explained that M.R. had become "very fearful . . . in going out" and doing "things . . . with friends." She was scared and, for the longest time, would not go anywhere.

At the time of trial, M.R. still did not like to go out with her friends, and she feared being out after sunset. Mother testified about a specific incident that had happened a month before trial in which M.R.'s car broke down. She explained that M.R. had had an anxiety attack on the side of the road.

Mother testified that the sexual assault had impacted their family as well. She told the jury that "it hurts. When [M.R.] hurts, when she's broke[n], we're all broke[n]."

## II. Discussion

In a single point of error, Washington argues that the trial court erred by allowing the State to call Mother to testify as a rebuttal witness. Washington asserts that Mother testified in violation of "the Rule" and that she was not a true rebuttal witness.

This case can be resolved on harm. Because any error in the admission of Mother's rebuttal testimony had only a slight—if any—influence on the jury's verdict,

11

we need not address whether the trial court erred by admitting the testimony. *See Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023); *see also* Tex. R. App. P. 47.1 (requiring that opinion be "as brief as practicable").

## A. Standard of Review

Generally, a trial court's error in admitting or excluding evidence is nonconstitutional error, which we review under Texas Rule of Appellate Procedure 44.2(b). *See Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). Rule 44.2(b) requires us to disregard any nonconstitutional error that does not affect an appellant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 766, 66 S. Ct. 1239, 1253 (1946)).

Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilty, and (4) whether the State emphasized the

complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

## B. Violation of "The Rule"

At either party's request, the trial court must order that witnesses be excluded from the courtroom so that they cannot hear other witness testimony. Tex. Code Crim. Proc. Ann. art. 36.03; Tex. R. Evid. 614. The purpose of "the Rule" is to prevent witnesses from altering their testimony, consciously or not, based on other witnesses' testimonies. *Routier v. State*, 112 S.W.3d 554, 590 (Tex. Crim. App. 2003); *Qualls v. State*, 547 S.W.3d 663, 676 (Tex. App.—Fort Worth 2018, pet. ref'd).

On appeal, Washington broadly asserts that Mother's testimony was "tainted" because she "heard the entire defense." He does not describe how Mother's testimony was "tainted," nor does he identify any testimony that she purportedly altered as a result of "hear[ing] the entire defense." We conclude that, even if the trial court erred by allowing Mother to testify in violation of "the Rule", any error was harmless.

At Washington's punishment trial, the trial court invoked "the Rule" and admonished the testifying witnesses that they could not be present in the courtroom during the testimony of other witnesses. Because the State had not listed Mother as a potential witness and only called her as a rebuttal witness after the defense closed, she

was not among the witnesses admonished, and she remained in the courtroom for all the witnesses' testimonies—except M.R.'s testimony.

Mother heard Casey's testimony about the events that happened immediately after the sexual assault and about how the sexual assault had affected M.R.'s life. Specifically, Casey testified that M.R. had "completely changed," that she was afraid to drive or do anything by herself, and that her life was "not the same." Similarly, Mother's testimony described the impact that the sexual assault had had on M.R.'s life. She testified that, before the sexual assault, M.R. was "very outgoing, very fun," and liked to "go out." After the sexual assault, Mother observed a personality change in M.R.; she became "very fearful" and would not go out anymore.

Assuming without deciding that the trial court erred by admitting Mother's testimony in violation of "the Rule," Washington's substantial rights were not affected. *See* Tex. R. App. P. 44.2(b); *Macedo*, 629 S.W.3d at 240. In assessing Washington's punishment, the jury heard cumulative testimony describing how the sexual assault had affected M.R.'s life. Indeed, the jury heard similar testimony not only from Mother and Casey but also from M.R. herself—when Mother was out of the courtroom. Moreover, Mother's testimony was brief, comprising only five pages out of approximately four hundred pages of testimony in the record, and the State did not emphasize the testimony during its closing argument. *See Oliphant-Alston v. State*, Nos. 02-12-00628-CR, 02-12-00642-CR, 2013 WL 6198844, at *6 (Tex. App.—Fort Worth Nov. 27, 2013, no pet.) (mem. op., not designated for publication).

14

In the context of all the evidence admitted during punishment, and after reviewing the record as a whole, even if the trial court erred by admitting Mother's testimony in violation of "the Rule", her testimony did not influence the jury's assessment of punishment—or did so only slightly—and did not affect Washington's substantial rights. *See Macedo*, 629 S.W.3d at 240; *King*, 953 S.W.2d at 271. Thus, we disregard any alleged error. *See* Tex. R. App. P. 44.2(b).

## C. Rebuttal Witness Testimony

Upon request by the defense, the State must disclose its witnesses. *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993). But the State is not required to disclose rebuttal witnesses because it would be unreasonable to require the State to anticipate the need to rebut unforeseeable defense evidence. *See Elkins v. State*, 543 S.W.2d 648, 649 (Tex. Crim. App. 1976); *Hoagland v. State*, 494 S.W.2d 186, 189 (Tex. Crim. App. 1973); *see also Burrell v. State*, No. 02-18-00242-CR, 2019 WL 4048862, at *3 (Tex. App.—Fort Worth Aug. 28, 2019, no pet.) (mem. op., not designated for publication) ("[G]enerally, 'the State is entitled to present on rebuttal any evidence that tends to refute a defensive theory and the evidence introduced to support that theory.'" (quoting *Davis v. State*, 979 S.W.2d 863, 867 (Tex. App.—Beaumont 1998, no pet.))). The decision to allow a witness who was not listed on the State's witness list to testify is within the trial court's discretion. *Martinez*, 867 S.W.2d at 39.

Washington argues that the trial court abused its discretion by admitting Mother's testimony as a rebuttal witness. He complains that the State had not

disclosed Mother as a potential witness before she testified, and he contends that her testimony was not true rebuttal because it did not rebut any evidence proffered by the defense.[4] We conclude that even if the trial court abused its discretion by admitting Mother's testimony as a rebuttal witness, Washington was not harmed by that error.

Mother's testimony was substantially similar to other testimony that was proffered without objection. Specifically, Mother's testimony about how the sexual assault had affected M.R.'s life echoed both Casey's and M.R.'s testimonies relaying the same. "The erroneous admission of evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" *Cook*, 665 S.W.3d at 600 (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)). Thus, any error in admitting Mother's testimony as a rebuttal witness was harmless because other evidence of the sexual assault's effect on M.R.'s life was admitted without objection. *See id.*

---

[4]Notably, the State appears to concede that Mother's testimony was not actual rebuttal evidence:

> [Mother] *did not contradict the testimony of any other witness, including . . . Gallegos*, concerning the [e]ffect the crime and its aftermath had on Gallegos' relationship with [Washington]. It merely provided the jurors knowledge of the impact of the crime on the victim's family from [Mother's] perspective. [Emphasis added.]

We also note, however, that Mother's testimony concerning the impact that the sexual assault had on M.R. arguably rebutted Gallegos's testimony that what Washington did to M.R. was "not necessarily" one of the most horrendous things a person could do to someone. Nevertheless, we need not reach that holding to address the trial court's alleged error.

The jury also heard other evidence supporting its verdict. In addition to Mother's testimony, the jury heard testimony from other witnesses who described (1) how violent the sexual assault was, (2) how Washington chose M.R. as his victim; (3) M.R.'s fear both during and after the sexual assault; (4) how M.R. had changed since the sexual assault; (5) M.R.'s SANE exam and its findings; (6) Sergeant Owen's investigation of the sexual assault; (7) Washington's confession; and (8) a previous, similar violent incident with another alleged victim, J.W., in what appeared to have been an attempted sexual assault. It also heard (1) Gallegos's attempts to paint a different picture of her boyfriend and (2) Dr. Schmitt's professional opinion of Washington based on a rushed psychological evaluation and one-sided information. Considering all the punishment evidence, Mother's testimony was relatively insignificant. *See Macedo*, 629 S.W.3d at 240. Indeed, it comprised only five pages in the record, and the State did not emphasize the testimony during its closing argument.

The jury charge in this case instructed the jury that it was the exclusive judge "of the facts proved, of the credibility of the witnesses, and of the weight to be given their testimony." With this instruction, and presented with all the punishment evidence, the jury was able to reach a verdict on punishment in approximately one hour. Under these circumstances, "we have a fair assurance" that Mother's testimony "did not influence the jury or had but slight effect." *See Macedo*, 629 S.W.3d at 241.

Further, Washington objected to Mother's testimony and requested a mistrial because the State "called [Mother] in front of the jury" without providing prior notice

17

to the defense. He did not, however, request a continuance so that he could prepare for the testimony; therefore, any error would be harmless. *See Clemons v. State*, No. 01-98-00422-CR, 1999 WL 460069, at *2 (Tex. App.—Houston [1st Dist.] July 8, 1999, pet. ref'd) (not designated for publication).

In the context of all the evidence admitted during punishment, and after reviewing the record as a whole, even if the trial court erred by admitting Mother's testimony as a rebuttal witness, her testimony did not influence the jury's assessment of punishment—or did so only slightly—and did not affect Washington's substantial rights. *See Macedo*, 629 S.W.3d at 240; *King*, 953 S.W.2d at 271. Thus, we disregard any alleged error. *See* Tex. R. App. P. 44.2(b).

### III. Conclusion

Having disregarded any error in the trial court's admitting Mother's testimony, we overrule Washington's single point of error. *See* Tex. R. App. P. 44.2(b); *Macedo*, 629 S.W.3d at 240; *King*, 953 S.W.2d at 271–73. Accordingly, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  February 20, 2025